We'll turn now to 24-2117, and I'm not going to be able to pronounce the name of the defendant. U.S. v. Bindue? I believe it's Bindues. Bindues, okay. Mr. Boland? May it please the court, my name is John Boland of the firm of Boland & Shaw, appearing on behalf of Mr. Jonathan Bindues. Now, I suspect that we can all agree that we don't want to live in a world where it's okay for a high school coach to ask a 15-year-old student for nude photographs. The good news is, of course, that that's not okay. There's a federal statute for enticement of a minor, Section 2422, of which Mr. Bindues was convicted in this case. And, of course, there are state-level statutes prohibiting that and other criminal sexual behavior with minors. But we're here for something else, which is whether those text messages can constitute coercion of a child for the purpose of producing child pornography. And our contention is that there's insufficient evidence of those particular elements. There were certainly many sexual discussions between the two. There were requests to see parts of Jane Doe's body, that sort of thing. But there is simply no request in these 17,000 text messages from Mr. Bindues that she create a photograph or a video of sexual activity or of lascivious exhibition of the genitals or pubic area of the minor in this case. There may not be coercion, but I believe the statutory language was employed, used, persuaded, induced, enticed, or coerced. Yes, Your Honor, it is. So we could totally agree with you that there wasn't coercion and still uphold the conviction on the ground that it was enticed or induced, couldn't we? No, Your Honor. I don't believe that there is evidence of enticement or inducement. No, no, no. Abstractly, even if you're right that there wasn't coercion, there still could be grounds, these other grounds. Yes, Your Honor. You just mentioned coercion. I thought, gee, I must have misremembered the statute. No, you're correct, Your Honor. I was just using one of the many different ways that you could prove it. But either way, since there was no request for... Well, how about I sent you a pic of my manhood, and what have you sent me, question mark, question mark? I mean, he wants reciprocal pictures. Well, there's no question that he did ask for nude photographs. But the references that the government relies on in this case are never any more specific than that. I think that that particular exchange that the Court is pointing out is not a specific request. And because this case is quite different from your ordinary case that goes under this statute, I think that's the problem. How specific do you think it needs to be? Well, it has to reach the point where a jury could determine beyond a reasonable doubt that... His intent was to convince her to send a video. His purpose was to convince her to send a video specifically of sexual conduct. And reading those 17,000 text messages, it's certainly sufficient evidence that he induced her into sexual contact, into sexual discussions, and even to send nude photographs. But he just hasn't taken that final step in those text messages. Does it matter how she interpreted it? I mean, it's pretty clear she interpreted it that he wanted a video. And, I mean, I don't want to get too graphic here, but she talks about a video of her fingering herself. I mean, she certainly understood that's what he wanted. Does that mean that the jury could look at that and infer it was his intent for her to understand that? Well, I don't think you could infer from that fact that she thought he was trying to get her to do that. At most, I think you could infer that she decided to do that. And I think there's a very small but important difference in that this conduct just hasn't crossed the line. She offered to send him a sneak peek, which she understood to be nudes. And he said, F, a sneak peek, I want more baby. And then she responded that she was too tired to take a video right now. I mean, it seems to me that a jury could look at that and it would be sufficient evidence under the requirements of the statute. Respectfully, Your Honor, we disagree because it just hasn't crossed that line into asking for that type of video. So you think he had to say, I want you to send me a video of you performing a sex act on yourself? He wouldn't have to use that formal language, but he'd have to make some kind of request to like that in order to transform this. Because in the ordinary case, the criminal defendant is often, you know, using the camera themselves. Often they may have, you know, a sort of customer base for this or a place where they upload these photographs. That's what we all think of when we think of someone producing pornography. But in this case, Mr. Bindu's had an inappropriate sexual relationship with Jane Doe. And through their text messages, these videos were exchanged. But there isn't enough evidence to take that into the world of producing child pornography. He says he wants, he's still waiting to watch you, though. No, I want to watch you with yourself. I mean, that doesn't sound like a nude photo. That sounds like action. Yes, Your Honor. That particular exchange was from her comments of how she wanted him to watch her while having sex. And she said, but I guess you don't really have to watch me because you can feel me, which implies that this whole, that portion of the discussion was all about in-person sexual contact. And so that he wanted to watch her in person as opposed to create a video and send it to me, as we may be thinking. Now, we also raised as an issue in our brief whether the district court erred in allowing the government's expert witness who showed up to testify about grooming behaviors. I was confused by your brief of whether you're arguing that the district court failed to perform its gatekeeping function or applied the wrong standard in doing so, or whether you're saying that the court applied the correct standard but abused its discretion. And the reason it matters is there are different standards of review. Yes, Your Honor. The court, in our opinion, just abused its discretion when attempting to fulfill its gatekeeping role. Because the court did give Mr. Bindu's all the procedural process that he was entitled to. Obviously, there was a Dauberk hearing, and the court made its decision according to the proper principles of law. But, of course, the court, in our view, misapplied those principles of law. And in doing so, it led in an expert testimony and argument from the government that Mr. Bindu's had groomed this victim. But the topic of grooming is not an established scientific term. Our expert pointed out to the court that there was no consensus among anyone in the field as to what grooming is or isn't. And so, ultimately, our argument is that the label grooming had no meaning at all other than to inflame the passions of the jury against Mr. Bindu's. The jury was entitled to and certainly did read much of the 17,000 text messages that were put in evidence in this case. Ms. Dau testified extensively about them as well on the stand. And so they had the entire interaction between the two right in front of them. And so the expert testimony that would characterize this as grooming was unnecessary, irrelevant, and also prejudicial. So under any of those factors, we believe that the expert testimony should have been excluded. And, of course, that its inclusion prejudiced Mr. Bindu's because the jury was presented in this case, as we just discussed, for example, with a sort of abnormal application of the child pornography statute. And so the jury had to make that leap or inference, as Judge McHugh mentioned, to get from this interaction and those text messages to their interactions as a whole being evidence that he induced Ms. Dau to create these videos. This is an unreported decision, but there's a recent unreported order in judgment of our court, United States v. Rivera. Are you familiar with that? Yes, Your Honor, yes. I did review that case. Do you distinguish that? I realize it's not binding on us, but can you distinguish the situation there? It's not binding on this court, and I think that the decision is incorrect and that this court should not follow it. I think that grooming is, the grooming decisions are still all over the map because this is, well, I don't know that it's very new, but in applying these standards to our normal Daubert standards, it doesn't fit. Well, the normal standards are perhaps scientific expertise, things like that, but the rule doesn't require it to be scientific evidence. It seems to me it's kind of like the testimony you get when there's been a sexual assault on a very small child. Well, not necessarily a very small child. And there'll be an expert come in and say it's not unusual for young girls not to report this sort of assault for long periods of time. And how is that, how is the evidence, the type of evidence we're talking about here, different from that type of evidence, which is, I think, well recognized as admissible? You're correct. That is a well recognized form of evidence, Your Honor. And that points to, this is a new argument from the government on appeal, that instead of the scientific style evidence being grooming, that an officer is allowed to speak about things that are based on their experience as a police officer. And the government cites the Garza case in that regard, which is specifically about using code words in the drug trade. And that's something that the jury doesn't understand and that a police officer in the drug world would. But that is quite different from the FBI coming in and saying, we've established a constellation of behaviors that some sex offenders exhibit, and we can't tell you if you see those behaviors, whether grooming is happening or not, until we know that there has been inappropriate sexual contact between parties. I thought the point that the government was trying to make, the prosecutor was trying to make, was that you don't have to coerce these young girls into this conduct. It can be done through subtler, less forceful behavior by the adult male. And just because I'm not sure that people in general would appreciate that that sort of thing happens. So isn't that what the purpose of this testimony is? And isn't that very similar to saying, you know, lots of these young girls don't report the sexual assault for months or years even? Isn't it? Isn't that the same sort of thing? Just explaining, yeah, this may not be, this is something you're not familiar with, members of the jury, but this sort of thing happens. Isn't that the nature of the testimony here? And isn't that valuable to the jury? No, Your Honor, that's not really what Agent O'Donnell testified to. He testified to certain grooming behaviors like isolating a victim and, you know, pretending to be their friend, that sort of thing. But he couldn't in the end say whether those behaviors constituted grooming in a particular case or not, or how the jury could take those behaviors and do anything with those facts. And because Agent O'Donnell had not actually reviewed the facts of this case and didn't talk about this case at all, he couldn't, you know, make the point that, you know, young girls can be persuaded in a different way under these dynamics because he didn't know that and he didn't really testify to that kind of facts. Well, wouldn't you be more upset if he had actually come in and testified, said to the jury, and this case is grooming, he groomed her? Yes, Your Honor, absolutely. So, I mean, that's typically how it's done, isn't it? That they don't say, this young girl didn't report the abuse for many years because of this. They say it's been shown that the delay can be explained. I see that I'm out of time to answer the question.  Okay, thank you. That just made me lose my train of thought. Thank you. Yes, we would be, of course, more angry, as the court put it, if he was talking about the case specifically. But our contention is that both are impermissible. He shouldn't have been allowed to testify in either way. Thank you. Thank you, counsel. Ms. Roybal. Good morning. May it please the Court, Jamie Roybal on behalf of the United States. Because Mr. Boland started on the sufficiency of the production count, I'm going to start there as well. As the Court is aware, our primary witness at trial was the victim herself. She testified that during the time frame of the charging time frame, she was 14 years old. Towards the end of that charging time frame, she turned 15 years old. And really, the core of our evidence, which I would represent against Mr. Bindu's, was quite overwhelming, was the 17,275 text messages that the jury got to see. Those text messages provided the jury with a very clear picture of how a relationship between a coach and a 14-year-old athlete turns into a sexual relationship. And I think there was no better evidence for the jury than to see Mr. Bindu's own words. So by the time we got to the conclusion of the charging time frame, there was really no reasonable debate in the courtroom about whether he used, coerced, enticed the minor into producing child pornography for his benefit. Of course, this Court reviews sufficiency questions. When viewing the evidence in the light most favorable to the government, you ask the question of whether a reasonable jury could have found Mr. Bindu's guilty beyond a reasonable doubt. And I would submit that that answer is a very firm yes. Your Honor, as you pointed out, there were multiple ways that we could prove the production count. It was that he employed, or used, or persuaded, or induced, or enticed, or coerced the minor into producing the images. And what I would point to, I sort of just disagree with the characterization that because he never asked her for an explicit, could you please send me a video depicting sexually explicit conduct, that type of ask I don't think is required. But I would actually submit that that evidence is in the record. So I'm going to step back a couple of months in terms of the charging time frame. We charged dates of June, which is actually the production, the metadata on the images showed that those were produced in June. But I would point the court to a couple of months back, I would say so far it's beginning in March. And you can see how that line between Mr. Bindu's and the minor gets moved just a bit more every time until he gets what he wants. And I would submit that is evidence of coercion. That is evidence of enticement. And when the court has to look at the totality of the circumstances in this case, what we have is an adult with a position of trust within the community who is abusing that position of trust to have this relationship with the minor. She is an athlete on two of his teams. So for example, the most innocent, so to speak, of the exchanges, I would point the court to the second supplemental record, pages 324 to 325. Mr. Bindu's took a screenshot of our minor victim that was a photo of her as a child. He took that from her mother's Instagram account. And he sent it to her with an emoji that had heart eyes that said, so cute. That's not, I guess, necessarily in and of itself an exchange that would rise to the level of a federal criminal violation. But that line gets moved slowly between March and June. So for example, if we move to April the 10th of 2021, the discussion is a little bit more explicit. At this point, Mr. Bindu's is talking to the minor about the size of her breasts and what size of bra that she wears. And so I would point the court to, again, the second supplemental record, pages 1080 to 1091. And Mr. Bindu's tells her, ha ha, now I'm curious, right? And you'll notice a lot of the messages that Mr. Bindu's sent had the phrase ha ha in it. And it was kind of like a wink wink, right, is how those were interpreted, I think, how they were testified to at trial again. But she sends him a photo, and she's wearing a dress. And she says, this is what I looked like in my Easter dress. The conversation, as you'll see through that portion of the exchange, turns graphic, as many of these did. And the victim said, ha ha, you get the PG version of how you'd see me. And he said, PG is for kids. That's at the second supplemental record at page 1091. And so, again, he's pushing her to give him more, right? And I think that was the theme that was really reflected in the case, is that every time Jane Doe sent something, he wanted more. And so those discussions did get more explicit when he tells her things, such as on April the 10th, ha ha, I had you sending non-PG versions in mind. At one point, he is more explicit and says, on May the 2nd, send nudes. That's at page 2051 of the second supplemental record. And I would point the court, again, to what I'll say is the hardest part of this trial was distilling the trial presentation because of how much evidence there was. That problem represents itself here today as well. There are just so many examples. You know, but when he, for example, May the 8th, Jane Doe sends Mr. Bindu's photos of some crafts and some paintings that she had done. And that conversation turns into him saying, you can give me another image if you feel like it. Jane Doe says that she's wearing pajamas. And he responds, dang, guess I'm not worth a little extra effort. That's at page 2191 of the second supplemental record. So there are discussions in April and May that are slowly moving that line back. That by the time we get to the end of May and the beginning of June, it is not unclear in any way what he wants. Judge McHugh, you pointed out an exchange on May the 25th of 2021 where Jane Doe is discussing that she's too tired to take a video. And Mr. Bindu's response with that is an excuse. Again, with the dynamic that this is her high school coach, that they are in a relationship that she believes he's going to marry her one day because he has set a wedding date that is fake. She is in a position where she wants to make him happy. She testified to that at trial, that him being happy with her and with what she was doing was something that was important to her. But on that exchange, which is on page 2680 of the second supplemental record, Jane Doe is extremely graphic about the type of video that if she's going to send him, what it's going to entail. And I think that the court can infer Mr. Bindu's intent when he responds, oh, expletive baby, I can't wait. He does not say no. And I think some of the characterization in the brief was that, well, just because he didn't say no, then that means that he is not guilty of a federal crime. And I would say that that's not the standard. Again, there is ample evidence in this record that he is using the minor, that he is employing the minor, that he is, at this point in the time frame, has already had sex with the minor multiple times, that it is not unclear to her exactly what he wants to see. So by the time we get to June 11th, where he says, I'm still waiting to watch you with yourself, when viewed in the context that just a few weeks earlier, she had described essentially a masturbation video. And he confirmed that that is what he wanted. So I would disagree with the characterization that he just didn't say no. In fact, he said yes. So in terms of the actual production time frame, which was June the 12th to the 13th, again, I think that when the court views that in context, you will see that there was overwhelming evidence that he did make that request. So what's important, I think, at page 2982 of the, yes, Judge? You need to save some time for the expert testimony. I will. I'll wrap up this final point and then move to that. Mr. Bindu sends Jane Doe a text message that says, I'm wondering if you're able to call. There was evidence at trial that the two, in fact, had a 19-minute phone call that was just after 11 p.m. And then you can read the exchange that follows that really goes from page 2983, I would say, to about page 3000. The discussion is very explicit. It's very sexual. The two talk about sexual acts that they intend to perform on one another. And Mr. Bindu says, are you going to show me? That is the request. That is the explicit request. And then when Jane Doe says, is that what you want, he says, of course. I also think that the court can infer Mr. Bindu's intent was quite clear in his reaction to the videos after Jane Doe sent them. He said that he couldn't find it in himself to get rid of them, that when he deleted them, he was devastated. And then he asked for them again. So that is my argument on the sufficiency of the evidence. Any reasonable jury presented with these facts could have found Mr. Bindu's guilty. I'm going to switch you to the expert. Yes. In United States v. Isabella, we were dealing with an attempt case. And in order to show both specific intent and a substantial step, we held that evidence testimony about grooming was essential for the jury to understand what was being attempted by the conduct. Here we have a completed offense. And so I'm not sure really what grooming has to do with the crimes that this particular man was charged with. Can you deal with that? Yes, Your Honor. First, I would say that dating back to the Batten case in 2010, grooming is an accepted topic of expert testimony in this circuit. It was raised again in the Isabella case, and then in the Flex case in 2024, and as recently in the Rivera case earlier this year. In terms of—essentially, I'm receiving the court's question as an irrelevance question. And I think that grooming is proper modus operandi testimony, and I think that's how it's been interpreted in our circuit. And certainly it is helpful in this particular case. I took a rough note of something Mr. Boland said about to the extent of when you think of people producing child pornography, it's in an online forum, right? Uploading it and sharing it. And I think that's precisely why it was particularly helpful to the jury in this case. One of the findings that the district court made is that the average person may not be familiar with all of the different methods that sex offenders can use. And certainly every sex offender utilizes a different method, so to speak. And so I would submit that it was particularly helpful in this case, again, because the question of how, how did this happen? How does a high school coach end up in a sexual relationship with a minor? And how does it appear that the minor almost seems like she's consenting to the activity? That was a big, I think, narrative at trial as well, that the defense... Well, she couldn't consent. Could she legally? That was an interesting discussion we had. There was no jury instruction to that effect, but that was sort of the argument. She pursued him. I think at one point, Mr. Bendews' trial counsel asked Mr. O'Donnell, or Agent O'Donnell, if it's possible for a minor to groom an adult. And the narrative painted on cross-examination of Jane Doe at trial was, but isn't it true that you wanted this? You sent this explicit text message. You did this. And so I would submit that in this case, it was particularly helpful to members of the jury who may be inclined to sort of blame the victim. They needed to understand that Mr. Bendews was actually engaging in a pattern of activity that was intended to get her to submit to sexual contact. The other thing that I think is very helpful to point out, part of the argument at the district court, and it's renewed again here today, is that there's different definitions of grooming. Different experts utilize different definitions. There are differing definitions of the term grooming within our own circuit law. And so if you look at those four cases that I highlighted, Batten, Isabella, Flex, and Rivera, they all define grooming in a different way as well. But there is no case in the Tenth Circuit that says that grooming cannot be a recognized method of expert testimony. But it's got to be relevant to something.  I actually think Judge Hartz made a better argument than I saw in the brief, which is that it goes to enticement. I think yes. It went certainly to both counts, and I think it helped the jury understand, you know, its purpose was to educate. Its purpose was not to say Mr. Bendews did or did not groom the victim. That was open for argument, and it was not contested that the parties could argue that. Blind testimony, I certainly think, is less prejudicial to a defendant than, as the court pointed out, if Ajan O'Donnell had come in and said, I reviewed these facts, and this was grooming. That was just simply not the facts that we had at trial. One thing I would point out, just in closing, is that, you know, during Ajan O'Donnell's testimony, I asked him about the differences in the grooming literature. That's not something that we sort of shied away from. And he acknowledged that there are differences in the academic literature, but the purposes of grooming in everyone's definition is to engage a child in sexual contact and to prevent disclosure. So I see I'm out of time unless there are further questions. Thanks very much. Case is submitted. Counselor excused, and we're going to take a brief break.